**SIGNED THIS: June 27, 2024**

_____

**Peter W. Henderson
United States Chief Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

In re:

**CHARLES ROBINSON and
CANDY HAZZARD,**

**Case No. 23-90537**

**Debtors.**

### OPINION

      The Debtors propose in their Chapter 13 plan to pay creditor LaMont Brown an estimated $6,000 to satisfy an arrearage on their residence in Danville, Illinois. They filed a proof of claim on Brown's behalf, see Fed. R. Bankr. P. 3004, alleging that $6,000 is owed to "Conclude Sale of Real Estate on Installment Agreement." Brown takes a different view of the situation, insisting that in fact the Debtors do not own the residence and have no right to cure a default on a lease contract that by its terms expired years ago. He thus objects to confirmation of the plan, both because the lease cannot be revived and because the Debtors actually owe over $13,000. The Court thanks counsel for their memoranda outlining the legal nuances of Brown's objection. The objection will be overruled in part.

# I

The relevant facts are undisputed. In October 2017, the Debtors, Charles Robinson and Candy Hazzard, entered into a contract with Lamont Brown entitled "Lease to Buy Contract." The contract describes the Danville residence at issue and contains several pertinent provisions:

> [The Debtors have] agreed to a Lease To Buy contract for said property … in the amount of $20,000.00 and agree[] to purchase the property as is.
>
> …
>
> Additional Lease to Buy conditions are[:] On September 1, 2017 Charles Robinson agrees to pay LaMont Brown or his designee a $1,000.00 cash down payment followed by a monthly payment of $450.00 cash for a period of forty-two (42) months. The Lease To Buy monthly payments begin on October 20, 2017 and the final payment of $450.00 will be October 20, 2021.
>
> …
>
> In the event Charles Robinson fails to make the required monthly Lease To Buy payment/late payment as stipulated, Charles Robinson agrees that LaMont Brown or his designee can/will terminate this Lease To Buy contract and Charles Robinson can/will forfeit all funds paid towards the purchase of the property in question. **In addition, if the balance is not paid in full by the agreed upon payoff date,** Charles Robinson agrees that LaMont Brown or his designee will terminate this Lease to Buy contract and Charles Robinson will forfeit all funds paid toward the purchase of the property in question.

The contract also provides that Robinson was to maintain property insurance and assume all financial responsibility for maintenance and utilities. Though Brown agreed to continue paying property taxes, Robinson agreed to reimburse him for those taxes in a timely manner. Robinson agreed that if he did not repay Brown the amount of the property taxes, then Brown or his designee "will terminate this Lease to Buy Contract" and Robinson would forfeit "all funds paid toward the purchase of" the Danville home. Finally, the contract provides for a $45 late fee if monthly payments are not received by the 20th of each month.

At some point, the Debtors defaulted on their payments. In June 2020, Brown served a "30 Day Landlord's Notice to Vacate" on the Debtors demanding possession of the home. In October 2021, Brown filed a complaint seeking possession under the Illinois Forcible Entry and Detainer Act in Vermilion County Circuit Court. The Debtors filed this bankruptcy case shortly before the eviction complaint could be tried. Brown claims that the Debtors have made no payments in 41 months; according to him, the contract balance is $5,500, and the Debtors owe about $4,500 in insurance, $2,400 in taxes, and $1,300 in late fees. The Debtors dispute those numbers, though it is unclear to what extent; they do argue that any late fees have been waived and assert that they have paid the real estate taxes, which are assessed to their names.

## II

Two matters must be addressed in resolving the plan objection. First, the Court must determine whether the "Lease To Buy Contract" is an executory contract (*i.e.*, a lease) or a security agreement (*i.e.*, a typical real estate installment contract). The Court must then apply the pertinent Bankruptcy Code provisions to the contract.

### A

The first matter requires interpreting the contract, which the Court does by applying Illinois law. See *Butner v. United States*, 440 U.S. 48, 55 (1979). The contract is entitled "Lease to Buy." That is not a term of art under Illinois law. On one hand, Illinois recognizes residential leases that include options to purchase the premises during or at the expiration of the term. *Stanwood v. Kuhn*, 132 Ill. App. 466, 1907 WL 1731 (Ill. App. Ct. 1907). In bankruptcy parlance, such a lease would be an "executory contract" subject to the provisions in the Bankruptcy Code applying to leases. On the other hand, Illinois also recognizes real estate installment contracts in which the buyer pays the purchase price over a set period of time. *Shay v. Penrose*, 185 N.E.2d 218, 219–20 (Ill. 1962). When such a contract is entered, the buyer acquires equitable title to the property while the seller retains legal title in trust for the buyer. *Id*. Such a contract is not an executory contract under bankruptcy law, as the Seventh Circuit interprets it, but rather a security agreement "where the vendor holds legal title in trust solely as security for the payment of the purchase price." *In re Streets & Beard Farm Partnership*, 882 F.2d 233, 235 (7th Cir. 1989). As a security agreement, it is subject to the Bankruptcy Code provisions that deal with secured claims.

It is not always that simple; a real estate installment contract may be considered an executory contract if the parties intend that the property will not vest in the buyer until the contract is fully performed and the deed delivered. *Ruva v. Mente*, 572 N.E.2d

3

888, 892 (Ill. 1991). That is in line with Illinois' general approach to contract interpretation, which as a "cardinal rule" attempts to give effect to the parties' intent, which is to be discerned from the contract language. *Virginia Surety Co., Inc. v. Northern Insurance Co. of New York*, 866 N.E.2d 149, 153 (Ill. 2007). But absent such an intent, Illinois treats real estate installment contracts as security agreements that are similar to mortgages. (Indeed, certain real estate installment contracts are subject to the same foreclosure requirements as mortgages. 735 ILCS 5/15-1107; see generally *In re Brown*, 249 B.R. 193, 195–96 (Bankr. N.D. Ill. 2000), for a discussion of real estate installment contracts.)

The contractual language here evidences a security agreement, not an executory contract. Apart from the title of the document, no mention is made of lease payments or an option to purchase during the lease term. Instead, the contract three times refers to the "purchase" of the home by the Debtors, and the contract provides for that purchase through monthly installment payments. Cf. 735 ILCS 5/15-1214 (defining "real estate installment contract" as "any agreement … under which the purchase price is to be paid in installments with title to the real estate to be conveyed to the buyer upon payment of the purchase price or a specified portion thereof"). The contract assigns responsibility to the Debtors to pay utility costs, taxes, and insurance. No provision of the contract addresses when the property will vest in the Debtors. Other than the "Lease to Buy" nomenclature, all signs point to this contract being a real estate installment contract in which the Debtors held equitable title in the home and Brown retained legal title in trust for the Debtors. See *Shay*, 185 N.E.2d at 219–20. Because this Court must "consider the document as a whole and not focus on isolated portions of the document," *Salce v. Saracco*, 949 N.E.2d 284, 288 (Ill. App. Ct. 2011), it finds that the parties intended to enter a real estate installment contract, not a lease. This is an agreement to buy a house, not to rent one.

For what it's worth, the Debtors' exhibits reinforce that conclusion. On at least two occasions, the Debtors noted that their payments were for the "mortgage." Doc. #42 at 2, 6. Vermilion County mostly assessed the taxes to the Debtors. Doc. #44. The Court's finding does not depend on those exhibits, but they underscore the parties' intention that the Lease to Buy Contract be construed as a real estate installment contract entitling the Debtors to equitable title to the property.

In his objection to the Debtors' plan and memorandum in support, Brown assumes that the contract was a lease or executory contract and jumps straight into the Bankruptcy Code's treatment of leases. He therefore provides no authority to rebut the straightforward characterization of the contract as a real estate installment contract.

4

B

Because the contract is a security agreement concerning the Debtors' principal residence, several provisions of Chapter 13 dictate how the Debtors may treat the secured claim in their plan.

A debtor's Chapter 13 plan generally may not modify the rights of a holder of a claim secured only by a security interest in real property that is the debtor's principal residence. 11 U.S.C. §1322(b)(2). Courts look to state law to determine the "rights" of such holders; those rights are typically reflected in the relevant security agreements. *Nobelman v. American Savings Bank*, 508 U.S. 324, 329 (1993). Though rights may not be modified, the plan may provide for the curing of any default. 11 U.S.C. §1322(b)(3). Under §1322(b), "cure" means to remedy or rectify the default and restore matters to the *status quo ante*. *Matter of Clark*, 738 F.2d 869, 872 (7th Cir. 1984).

A debtor does not have an unending right to cure, however. Section 1322(c)(1) permits a debtor to cure a default with respect to her principal residence only until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law. "That provision does not map onto installment contracts well: unlike a defaulted mortgage, a breached installment contract never ends in a foreclosure sale." *In re Peralta*, 48 F.4th 178, 180 (3d Cir. 2022). A court facing a breached installment contract thus must determine by analogy when a debtor's right to cure terminates. In Pennsylvania, the Third Circuit reasoned, that is when the vendor obtains a judgment for possession, *Peralta*, 48 F.4th at 181. It is similar in Illinois.

Judge Wedoff in *Brown* accurately described the process by which a default in a real estate installment contract is handled in Illinois. 249 B.R. at 195–98. Under the Illinois Forcible Eviction and Detainer Act, a person entitled to the possession of lands or tenements may maintain an action for possession "[w]hen a vendee having obtained possession under a written … agreement to purchase lands or tenements, and having failed to comply with the agreement, withholds possession thereof, after demand in writing by the person entitled to such possession." 735 ILCS 5/9-102(a)(5). A successful action results in a judgment for possession of the whole of the premises. 735 ILCS 5/9-110. That judgment, however, may be stayed at least 60 days and up to 180 days, depending upon certain circumstances. *Id*. During that period of stay, the defendant may cure the default if

> the defendant pays the entire amount then due and payable under the terms of the contract other than such portion of the principal balance due under the contract as would not be due had no default occurred and costs

5

> and, if the contract provides therefor, reasonable attorney's fees as fixed
> by the court, and cures all other defaults then existing.

*Id*. In that case, "the contract shall remain in force the same as if no default had occurred." *Id*. Thus, unlike in Pennsylvania, the judgment for possession does not terminate the debtor's right to cure in Illinois, because she retains that right during the 60- to 180-day stay after entry of judgment. *Brown*, 249 B.R. at 198.

No judgment for possession was entered in this case, of course, so the discussion of the post-judgment stay is unnecessary to resolve this dispute. The Debtors filed their bankruptcy petition just before Brown's complaint under the Illinois Forcible Eviction and Detainer Act could be tried. The Debtors are in time to cure a default on their principal residence. 11 U.S.C. §1322(c)(1). Brown's contention that it is too late to cure because the contract terminated on its own terms in 2021 simply does not account for §1322(c)(1).

Indeed, that is the principal misconception in Brown's arguments. He asserts that the plan "attempts to revive this contract." That is not an accurate characterization. The Debtors are not attempting to modify the contract to extend the payment term. 11 U.S.C. §1322(b)(2), (c)(2). They are attempting to cure the default. 11 U.S.C. §1322(b)(3), (c)(1), (e). The Bankruptcy Code permits them to do that, even though the amount needed to cure the default equals the entire amount due under the contract because its term has run. See *In re Chang*, 185 B.R. 50, 53 (Bankr. N.D. Ill. 1995) (explaining that curing the default on a fully matured mortgage is not a modification of that mortgage).

Brown notes that the required payments to buy the property were not tendered by the contractual date, but that has no relevance to whether a cure is available. The Debtors' failure to make timely payments establishes the default; it does not bear on whether that default can be cured. Under §1322(b)(3), the Debtors may cure the default, meaning they may remedy or rectify the default and restore matters to the *status quo ante*. *Clark*, 738 F.2d at 872. Supposing they do so, it will be as if the contract was never breached in the first place. Under Illinois law, the only remaining duty under the contract will be for Brown to transfer legal title to the property. So the fact that the payments were to be completed in October 2021 means only that no further performance is required by the Debtors so long as they cure the default.

6

## C

The question then becomes: how much is needed to cure the default? Again, the Bankruptcy Code answers that question by deferring to the parties' contract and state law. 11 U.S.C. §1322(e). So let's return to the Lease To Buy Contract.

The only penalty for default in the contract is a $45 fee for each late monthly payment. Of course, the amount necessary to cure the default will also include all missed payments and any other contractual payments that were missed (for example, for utilities, property taxes, or insurance). Brown asserts that that amount totals at least $13,634.89, comprising $5,500 in principal, $4,462.98 in insurance payments, $2,366.91 in taxes, and late fees of (at least) $1,305. The Debtors dispute that amount. First, they agree that they owe Brown for the cost of insurance premiums but will not agree on the amount without further documentation. They contend that they have paid all real estate taxes. Finally, they "argue any late fees that may have been incurred under the terms of the Contract have been waived by Brown." That last argument, though, is conclusory—it is unaccompanied by evidence or legal authority—so the Court does not know what to make of it.

Brown correctly identifies the items in default. The Court is confident that the parties can confer and negotiate the amount needed to cure the default, including the principal, taxes, insurance, and late fees.

Brown goes further, though, and requests both attorney's fees and "double rent" payments because the Debtors "willfully [held] over any lands, tenements, or hereditaments[] after the expiration of [their] term or terms." See 735 ILCS 5/9-202. Neither request is well-founded. The contract does not provide for attorney's fees in the event of default, so no attorney's fees are required to cure the default. See *Rexam Beverage Can Co. v. Bolger*, 620 F.3d 718, 734 (7th Cir. 2010) (describing Illinois' adherence to "American Rule" of litigation absent contrary statutory or contractual provision); §1322(e) (deferring to contractual and state-law requirements). And §9-202 is not applicable here. By its terms, it applies only to tenants, and the Debtors are equitable owners under a real estate installment contract, not tenants. Even if it did apply to equitable owners, though, §9-202 is penal in nature and is intended to compensate landlords when tenants know their retention of possession is wrongful. *Id*. at 728. Here, though, the Debtors propose curing the default, which would restore the *status quo ante* and thereby render their possession rightful. Section 9-202 is a penalty when a tenant cannot cure a default and wrongfully holds over; it does not inform the amount a purchaser under a real estate installment contract must pay to cure the default.

The fact that Brown has not received any payments for several years strikes him as inequitable. Were this a lease that could not be cured and assumed, he would have more of a grievance. But this is a real estate installment contract that carries many of the features of a mortgage. A mortgagee who lends money and then receives no repayments for years is entitled to foreclose on the property, and a homeowner is entitled to take advantage of the protections in the Bankruptcy Code to stop that foreclosure and remain in his home. Many mortgagees protect themselves with contractual provisions that call for attorney's fees and specify an interest rate upon default. E.g., *In re Adejobi*, 404 B.R. 78, 80–82 (Bankr. E.D.N.Y. 2009). Section 1322(e) gives effect to those bargained-for protections. Perhaps due to a close relationship with the Debtors, Brown here chose not to include any penalty for default in the contract other than a $45 late fee. Section 1322(e) gives the Debtors the benefit of that bargain.

### III

The Debtors may cure the default on their real estate installment contract through a plan that pays an amount equal to the principal, taxes, insurance, and late fees that are due under the contract. §1322(e). The parties shall confer and attempt to agree upon a number consistent with this Order. To the extent Brown believes that number would render the plan infeasible, or otherwise unconfirmable, he may continue to present those arguments at future hearings on confirmation of the plan.

# # #